UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRELL WILEY,<br><br>        Plaintiff,<br><br>    v.<br><br>UNUM LIFE INSURANCE COMPANY OF AMERICA,<br><br>        Defendant. | Case No. 3:19-cv-02756-WHO<br><br>**ORDER ON MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 73, 74, 84 |

Plaintiff Darrell Wiley purchased a disability insurance policy from defendant Unum Life Insurance Company of America ("Unum"). In response to a claim he submitted in 2015, Unum determined that he was disabled and began paying him. Under the policy, Wiley is entitled to 60 months of benefits if the disability is due to sickness and lifetime benefits if it is due to injury. Unum eventually determined it was due to injury. Wiley filed suit, alleging that Unum breached their contract and the covenant of good faith and fair dealing.

Unum moves for summary judgment on both claims. The motion is denied on the breach of contract claim. Unum's only asserted ground is that it has elected to pay Wiley beyond the 60-month period under a reservation of rights until this lawsuit is resolved. That arrangement, however, does not doom the claim. The motion is granted on the bad-faith claim because the parties have a genuine dispute over the scope of coverage and Wiley has not introduced a genuine dispute of material fact that Unum's handling of his claim or investigation were inadequate or unreasonable. Wiley's motion for summary judgment is on one discrete factual issue that is only relevant to the bad-faith claim and is, in any event, subject to genuine disputes of material fact.

# BACKGROUND

## I. FACTUAL BACKGROUND

### A. The Policy and 1996 Claim

In 1983, Unum issued a disability insurance policy to Wiley. *See* Dkt. No. 73-4, Ex. 1. The policy provides that, if Wiley became disabled as a result of his occupation, he would receive a monthly benefit of $1,500. *Id.* If the disability is due to "sickness," Wiley is entitled to 60 months of payments. *Id.* If the disability is due to "injury," he is entitled to lifetime benefits. *Id.*

In July 1996, Wiley was in a motor vehicle accident. *See, e.g.*, Declaration of Jodi Bishop ("Bishop Decl.") [Dkt. No. 73-1] ¶ 9. He submitted a claim to Unum in 1996 (the "1996 claim") under the policy. *Id.* ¶ 8. Unum offered to pay three months of benefits and close the claim, which Wiley accepted. *Id.* ¶ 9; *see also* Dkt. No. 73-4, Ex. 3 (memo memorializing conversation). In December 1996, Wiley told Unum that "he was getting worse" and asked to reopen the 1996 claim. Bishop Decl. ¶ 10. Unum did so, agreed to waive the premiums due, and decided to pay Wiley full benefits while it investigated the claim under a reservation of rights. *Id.* ¶ 12.[1] In February 1998, Unum informed Wiley it had "concerns" about the extent of his disability and entitlement to benefits, in part because he was performing his work, and asked for certain documentation. Dkt. No. 73-4, Ex. 7. In response, Wiley proposed that Unum pay him one month of benefits, not seek documentation, and close the claim; Unum accepted. *See* Dkt. No. 73-4, Ex. 8.

### B. The 2015 Claim

#### i. Initial Investigation and Determination

In January 2015, Wiley submitted another claim (the "2015 claim") to Unum. Bishop Decl. ¶ 7; *see also* Dkt. No. 73-4, Ex. 2. The claim stated that Wiley became unable to work on July 1, 2013. Dkt. No. 73-4, Ex. 2. It said the reason was "soft-tissue pain" in his shoulders, neck, and head that resulted in lack of focus and "chronic fatigue." *Id.* He reported that the pain had

---

[1] The Bishop Declaration and Unum's Motion both mistakenly say that this occurred in December 2016. As other parts of their filings and the documents from the time make clear, it occurred in 1996.

2

started "years" earlier but became "debilitating" in June 2013. *Id.* Wiley filled out the "illness" section of the form and left the "injury" section blank. Thomas Forest, a chiropractor, submitted a statement with the form that said Wiley had "chronic cervicothoracic ligament laxity and joint instability with cranial neuralgia. Constant right occipital HAs [sic] spread to right ear and facial area making it very difficult to concentrate, focus, and sleep." Dkt. No. 73-4, Ex. 10. Forest reported that he did not know whether the condition was due to sickness or an accident. *Id.* He said the pain began in 2002. *Id.* Greg Law, a medical doctor, also submitted a statement that said Wiley had "brachial neuritis or radiculitis and shoulder joint pain" beginning in November 2006. Dkt. No. 73-4, Ex. 9. Wiley also submitted the claim file from the 1996 claim. Bishop Decl. ¶ 20.

Unum referred the claim to healthcare professionals for evaluation in March 2015. *See* Bishop Decl. ¶ 20. Joseph Antaki, a medical doctor, reviewed both claim files, and concluded that Wiley did not have "restrictions and limitations" that would preclude him from working—in other words, that he was not "disabled" under the policy. Dkt. No. 73-5, Ex. 13. Antaki therefore did not offer an opinion on the "etiology"—that is, the cause of Wiley's disability. *Id.* Antaki also spoke with Forest and Law. *See* Dkt. No. 73-5, Exs. 14, 15. A second medical doctor, Joseph Sentef, reviewed the claims files in May 2015. *See* Dkt. No. 73-5, Ex. 16. Sentef agreed with Antaki that Wiley would be able to perform his job without restrictions and limitations. *Id.* In May 2015, after these assessments, Unum determined that Wiley was not disabled under the policy and denied his claim. *See* Dkt. No. 73-5, Ex. 17 (denial letter).

In July 2015, Wiley's counsel in this case, Laurence Padway, contacted Unum to review the claim files. *See* Bishop Decl. ¶ 29. In July 2016, Padway appealed the claim determination and submitted a CD that contained records discussed in more detail below. *Id.* ¶ 30. Among other things, Padway submitted another letter from Forest opining that the car accident caused a head injury that was finally manifesting. Dkt. No. 73-10, Ex. 70. A medical doctor, Michael Moskowitz, also opined that the car accident caused "significant trauma." Dkt. No. 73-10, Ex. 68. It appears that Wiley told Moskowitz and Forest that the car was traveling approximately 35 miles an hour; in a patient questionnaire Wiley completed for an MRI in 1996, he wrote that the other car was traveling 10 miles an hour. *See* Dkt. No. 73-4, Ex. 5.

3

Due to the appeal, Antaki and Sentef reviewed the new materials. *See* Dkt. No. 73-5, Ex. 20. They did not change their opinions. *Id.* A psychiatrist, John Szlyk, also examined the claim and found that restrictions and limitations *did* exist beginning January 3, 2015, based on examinations done then, but that it was unknown whether they existed prior to that time. Dkt. No. 73-6, Ex. 22.

In September 2016, Unum informed Padway that there was "support" for Wiley having restrictions and limitations "as of January 03, 2015 to present." Dkt. No. 73-6, Ex. 22. It therefore paid Wiley benefits from January 3, 2015, to October 3, 2016. *Id.* It also stated that more information was required to determine whether benefits would go back further (to Wiley's claimed start date in June 2013). *Id.* It asked for specific information by October 26, 2016. *Id.* Unum represents, and Wiley does not dispute, that Wiley and Padway did not respond by the deadline. *See* Motion for Summary Judgment ("Unum Mot.") [Dkt. No. 73] 8–9. Unum had already received a letter from the treasurer of Wiley's company stating that "[f]rom June 29th 2013 to December 14th 2014 [Wiley] was typically in the office 4 to 5 days a week and 3 to 3.5 hours per day." Dkt. No. 73-6, Ex. 25. Unum sent Padway three letters requesting the same information, in October, November, and December 2016, respectively. *See* Dkt. No. 73-6, Exs. 23–24. The last letter stated, "[i]f we do not receive this information by January 26, 2017, we will be unable to proceed with evaluating your clients [sic] claim back to June 29, 2013 and finalize our his [sic] date of disability as January 03, 2015." Dkt. No. 73-6, Ex. 24. Neither Padway nor Wiley responded, so Unum denied the claim for farther back than January 3, 2015. *See* Bishop Decl. ¶ 39; Dkt. No. 73-6, Ex. 26.[2] Wiley never appealed the decision. Bishop Decl. ¶ 40.

### ii. Second Investigation and Determination

In February 2017, Szlyk reviewed "[u]pdated file documentation," which included examinations of Wiley by doctors. *See* Dkt. No. 73-6, Ex. 27. After speaking with Moskowitz, Szlyk recommended a "psychiatric independent medical examination" to determine what

---

[2] Both the Bishop Declaration and Unum's Motion use the phrasing that Wiley and Padway did not provide "all of the information" that was requested. *See* Bishop Decl. ¶ 39. This odd phrasing may suggest that Wiley submitted some but not all of the requested documents. But Wiley's Opposition does not argue that he submitted anything, so I assume there were no responses.

restrictions and limitations there were and create a prognosis. Dkt. No. 73-8, Ex. 29. Unum requested the results of a 1998 neuropsychological exam from the doctors and Padway, who did not provide it. *See* Bishop Decl. ¶ 43. Before the examination could occur, Wiley filed suit in August 2017. The examination would eventually be performed in April 2018. Dkt. No. 73-11, Exs. 72–73. The lawsuit was dismissed. *See* Declaration of Robert Hess ("Hess Decl.") [Dkt. No. 73-2] ¶ 5. The independent psychiatrist, Trent Holmberg, gave a diagnosis of "somatic symptom disorder, with predominant pain, persistent, moderate." *See* Dkt. No. 73-8, Ex. 42. Without the 1998 neuropsychological test results, Holmberg opined, he could not find "specific restrictions or limitations" on Wiley's ability to work. *Id.*

In August 2018, Szlyk, benefits specialist Jodi Bishop, her superior, and "others" discussed Wiley's claim. Bishop Decl. ¶ 57. They decided to review the full 1996 claim file and find pre-1996 medical records, but they learned that the 1996 claim file had been destroyed in September 2015, apparently under Unum's general records policy. *Id.* ¶ 58. (Antaki and Sentef had reviewed that file before it was destroyed. *See* Dkt. No. 73-5, Exs. 13, 16.) Unum had, though, sent a copy to Padway in July 2015. It asked him to produce the medical records within; any others he had for Wiley back to January 1, 1996; and a copy of the 1998 test results. *See* Dkt. No. 73-8, Ex. 48. Unum sent letters requesting that information in September, October, and November 2018. Dkt. No. 73-8, Ex. 49. In the last letter, it wrote that if it did not receive it by December 20, 2018, it would make an "etiology" (again, "cause") determination. *Id.* Unum represents, and Wiley does not dispute, that Padway did not provide a copy of medical records dating back to January 1, 1996, or the 1998 test results. Bishop Decl. ¶ 62.

In December 2018, Unum determined that Wiley's disability was due to sickness, not injury. *Id.* ¶ 64. There was another discussion about the claim in February 2019; Szlyk maintained his opinion that Wiley was disabled under the policy. *See* Dkt. No. 73-9, Ex. 52. Unum therefore committed to paying until April 3, 2020, the end of the 60-month period due a policyholder whose disability is a result of sickness. Dkt. No. 73-9, Ex. 53. But, after this lawsuit was filed in May 2019, Unum wrote that it "has decided, for administrative purposes and in light of the ongoing litigation, to reopen Mr. Wiley's claim and to pay him benefits beyond April 3,

2020 under a reservation of rights." *See* Dkt. No. 73-9, Ex. 54. It explained that, "[s]uch payments will continue until the Court has provided its guidance on this issue or until the parties to the lawsuit have agreed on a settlement that address[es] it." *Id.* And it said that it "will not seek to recovery [sic] any benefits paid to Mr. Wiley under [the] reservation of rights." *Id.* Wiley does not dispute that Unum has continued to pay him the monthly payment each month.

Since this suit was filed, Unum also reviewed the 1996 claim file produced during discovery, the 1998 neuropsychological report, reports from 1998 by two other examiners, and an addendum by Holmberg (who reiterated the sickness etiology). *See* Bishop Decl. ¶ 70; Hess Decl. ¶ 6. In 1998, a neuropsychologist and neurologist also examined Wiley and concluded that it was unlikely Wiley's issues were due to the car accident and likely extended back into his teenage years. *See* Dkt. No. 73-9, Ex. 58; Dkt. No. 73-11, Ex. 71. Another doctor conduced an independent review of the file and found that, based on what was reported, he agreed with Atanki's prior conclusion that Wiley did not have an "inability to function." Dkt. No. 73-10, Ex. 61. Unum also reviewed radiology reports; its doctors concluded that they did not support findings of restrictions and limitations. *See* Dkt. No. 73-10, Exs. 64–65.

An administrative law judge at the Social Security Administration also found, in November 2017, that Wiley was disabled, and became disabled on July 1, 2013. *See* Dkt. No. 73-10, Ex. 60. (That decision did not address the dispute over sickness and injury.) Based on that determination, Unum determined that Wiley was entitled to benefits from July 1, 2013 to April 3, 2015, and paid them. Bishop Decl. ¶ 80.

Finally, in September 2021—after reviewing all of the materials made available during litigation—Unum again determined that the disability was not due to injury. *See* Dkt. No. 73-11, Ex. 67.

## II. PROCEDURAL BACKGROUND

Wiley filed suit against Unum in this Court in May 2019 for breach of contract, violation of the covenant of good faith and fair dealing, and declaratory relief. *See* Dkt. No. 1. The parties engaged in lengthy discovery, which was extended several times. *See, e.g.*, Dkt. Nos. 34, 36. I resolved several discovery disputes. *See* Dkt. Nos. 38, 47, 69, 83. On October 29, 2021, Unum

1  moved for summary judgment on the breach of contract and bad faith claims. On November 3,
2  Wiley moved for summary judgment on a factual issue. I held a hearing on both motions on
3  December 15, 2021.

**LEGAL STANDARD**

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial." *Id.* The party opposing summary judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

On summary judgment, the Court draws all reasonable factual inferences in favor of the non-movant. *Id.* at 255. In deciding a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

**DISCUSSION**

**I.    UNUM'S MOTION FOR SUMMARY JUDGMENT**

Unum for moves for summary judgment on the breach of contract and bad-faith claims. Alternatively, it seeks partial summary judgment that it does not owe any benefits prior to January 3, 2015, and on the issue of punitive damages.

To succeed on a breach of contract claim, Wiley must demonstrate "(1) [the] existence of the contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) damages to plaintiff as a result of the breach." *CDF Firefighters v. Maldonado*, 158 Cal.

1    App. 4th 1226, 1239 (2008), *as modified on denial of reh'g* (Feb. 5, 2008).

2    On the bad-faith claim, "[t]he law implies in every contract, including insurance policies, a covenant of good faith and fair dealing." *Wilson v. 21st Century Ins. Co.*, 42 Cal. 4th 713, 720 (2007), *as modified* (Dec. 19, 2007). The covenant applies in particular ways to insurance contracts. The insurance company "cannot deny the claim without fully investigating the grounds for its denial." *Id.* (internal quotation marks and citations omitted) Accordingly, it must "fully inquire into possible bases that might support the insured's claim before denying it" and not "ignore[] evidence available to it which supports the claim." *Id.* at 721 (internal quotation marks and citations omitted). The touchstone is the "reasonableness of the insurer's conduct under the facts of the particular case,"; as a result, "stating a general rule as to how much or what type of investigation is needed to meet the insurer's obligations under the implied covenant is difficult." *Id.* at 723.

### A. Full Payment Under a Reservation of Rights

Unum moves for summary judgment on both claims because it has voluntarily paid the full benefits that Wiley argues he is owed under a reservation of rights until this case is decided. *See* Unum Mot. 17–19. It contends that this payment means that Wiley has no claim.

Unum's argument is not required or suggested by the authorities it cites. If Unum committed to paying everything that Wiley believed he was owed (even under a reservation of rights) *in perpetuity*, the situation would be different. But here, Unum only committed to paying the larger amount *until this judicial proceeding resolves how much it owes*. None of the cases it cites hold that the claim is moot in these circumstances. *See, e.g.*, *Sherman v. The Paul Revere Life Ins. Co.*, No. CV 03-5730 DT(PJWX), 2004 WL 4946213, at *3 (C.D. Cal. Feb. 17, 2004) (holding there is no claim when the insurer pays the "*full* sum due [the plaintiff] under the Policy" and rejecting the argument that this full payment amounts to a breach *solely* because there is a reservation of rights (emphasis added)).[3] Under Unum's view, it could dismiss the claim in this

---

[3] In one of Unum's cases, the California Court of Appeal stated that "[f]or the purposes of this appeal, we will assume that Entin could not have asserted a breach of contract claim against Provident while it continued to pay him disability payments." *Entin v. Superior Ct.*, 208 Cal. App. 4th 770, 781 (2012). That explicit assumption was not a holding. *Entin* made the assumption it

8

suit for the circular reason that it promised to pay until this suit is dismissed.

## B. Genuine Dispute About Coverage

Unum also moves for summary judgment on the covenant of good faith and fair dealing claim. It argues that because there is a genuine dispute about whether Wiley's disability is due to sickness or injury, the bad-faith claim is barred as a matter of law. Wiley replies that, even if the dispute is genuine, he still has a viable bad-faith claim because Unum's investigation was unreasonable and inadequate. Wiley is correct that an unreasonable or inadequate investigation would keep the claim alive even if there were a genuine dispute, but he has not shown disputes of material fact that the investigation was improper. Unum is entitled to summary judgment.[4]

Under California law, the general rule is that "an insurer denying or delaying the payment of policy benefits due to the existence of a genuine dispute with its insured as to the existence of coverage liability or the amount of the insured's coverage claim is not liable in bad faith even though it might be liable for breach of contract." *Wilson*, 42 Cal. 4th at 723 (internal quotation marks and citation omitted). One example of a "genuine dispute" is a legitimate dispute over whether the facts trigger the insurance coverage. *See id.* This genuine dispute rule is not absolute. Relevant here, "[t]he genuine dispute rule does not relieve an insurer from its obligation to thoroughly and fairly investigate, process and evaluate the insured's claim." *Id.* The reason is that "[a] *genuine* dispute exists only where the insurer's position is maintained in good faith and on reasonable grounds." *Id.* (emphasis in original).

Wiley makes a number of arguments for why there are genuine disputes[5] of fact about whether Unum's investigation was incomplete and unreasonable. If he were right, the claim would proceed for the reasons stated above. If he were wrong—if Unum showed the investigation

---

did because it was part of the insurer's argument and the court ruled against the insurer *even assuming* it was correct on that point.

[4] Unum argues that the request for punitive damages rests entirely on the bad-faith claim. Wiley does not dispute this. Accordingly, the motion for summary judgment on punitive damages is GRANTED to the extent it is based on that claim.

[5] This section uses the phrase "genuine dispute" in two different ways, because that is the language both bodies of law have adopted. A "genuine dispute" about whether coverage is required as a matter of substantive insurance law is different than a "genuine dispute of material fact" for purposes of summary judgment.

9

1  was sufficient and Wiley failed to introduce genuine disputes of material fact about that—Unum
2  would prevail because there is both a genuine dispute over the extent of coverage *and* no dispute
3  about whether there was a sufficient investigation. For the reasons that follow, Wiley has failed to
4  show that there is any genuine dispute of material fact about the investigation's sufficiency.

5  Before discussing Wiley's individual arguments, I provide a brief recap of the
6  investigation. The parties largely agree on what happened in the investigation—that is, on the
7  facts (except for a few specific instances noted below). In the initial investigation, Wiley's
8  chiropractor and medical doctor described the disability without stating its etiology. *See supra*
9  Background, Section I.B.i. Unum sent the claim to two medical doctors, who determined that
10 Wiley was not disabled. *Id.* After an appeal, another doctor submitted a report and Unum's
11 doctors reexamined their opinions, but did not change them. *Id.* Unum sent the claim to a
12 psychiatrist who disagreed with the others and determined that Wiley was disabled. *Id.* As a
13 result, Unum paid on the policy but requested more information to see if it should pay from an
14 even earlier point. *Id.* It then followed up three times but Wiley—then represented by counsel—
15 never responded. *Id.* Unum paid only from 2015 onward and Wiley never appealed. *Id.*

16 In the second round of investigation, the psychiatrist asked for an independent medical
17 examination and Unum requested more records. *See supra* Background, Section I.B.ii. Wiley
18 sued instead. *Id.* The examination was performed and lawsuit dismissed. *Id.* Holmberg, the
19 independent psychiatrist, diagnosed Wiley with a long-standing somatic symptom disorder. *Id.*
20 Unum asked Wiley's counsel for the 1996 claim file three times because, without it, Holmberg
21 opined that he could not determine whether Wiley had specific restrictions or limitations. *Id.*
22 Unum again sent three letters but Wiley's counsel again did not respond. *Id.* Unum then
23 determined the disability was due to sickness. *Id.* After that determination, Unum reviewed the
24 claim, including the 1996 claim file, the 1998 neuropsychological report, and an addendum by
25 Holmberg. *Id.* In September 2021, Unum again determined the disability was due to sickness. *Id.*

### i. Incomplete and Selective Evidence

27 First and most substantially, Wiley tries to introduce a genuine dispute of material fact by
28 showing that Unum "cherry pick[ed]" evidence in its investigation. *See* Mot. 3–5. As noted

above, an insurer "cannot deny the claim without fully investigating the grounds for its denial," must "fully inquire into possible bases that might support the insured's claim before denying it," and cannot "ignore[] evidence available to it which supports the claim." *Wilson*, 42 Cal. 4th at 720–21 (internal quotation marks and citations omitted).

To show that Unum ignored evidence, Wiley has attached a chart of documents that his counsel allegedly sent to Unum but that were not in Wiley's claim file given to his counsel. *See* Opposition to the Unum Mot. ("Unum Oppo.") [Dkt. No. 78] 3; Dkt. No. 78-5. Even assuming that Unum failed to add these documents to Wiley's claim file when originally sent in 2016, Wiley has not shown that it renders the investigation unreasonable. As I explain, the named documents *were* ultimately reviewed by Unum and Wiley has failed to show that any specific and material document or category of documents was not reviewed.

First, Unum indisputably reviewed all of the documents that Wiley references with specificity (regardless of whether it downloaded them from the CD in 2016). The most important example is the 1996 claim file, which Wiley argues was on the CD his counsel sent but not in the 2015 claim file. *See* Unum Oppo. 4. But there is no dispute that the 1996 claim file was reviewed at least twice in ways that factored into Unum's review of the 2015 claim. The first time, Unum's two reviewing doctors examined the file in 2015. *See* Dkt. No. 73-5, Exs. 13, 16. The second time, Unum had obtained the 1996 claim file in discovery in this case; its benefits specialist states in an affidavit that she reviewed it when assessing the claim again, ahead of the September 2021 denial. *See* Bishop Decl. ¶ 70. She also had Unum's medical consultants review that file. *Id.* Wiley does not dispute this. Though that settles the question on that file, I note too that the record shows that, before the initial denial, Unum tried repeatedly to obtain a copy of the file once it learned that it had been destroyed. It was Wiley and his counsel that failed to respond to three separate attempts in 2018 to get a copy of the file. *See supra* Background, Section I.B.ii.

The next example in the Opposition is what Wiley calls "other medical records from the pre-2000 era, which are more fully identified in Mr. Wiley's motion for partial summary judgment." Unum Oppo. 4. That other motion then lists the titles of 28 records with no elaboration. *See* Motion for Partial Summary Judgment ("Wiley Mot.") [Dkt. No. 74] 4–5.

11

1  Neither brief explains the contents or significance of these records, so it is difficult from the start
2  to determine that a failure to review them would be material. In any case, any failure to download
3  these records from the CD does not create a genuine dispute of material fact about the
4  reasonableness of the investigation. Wiley admits that these "pre-2000 medical records" *were*
5  added to the claim file on June 30, 2021. *See* Unum Oppo. 4. One of these allegedly missing
6  records, for example, simply states it is a "medical record[]" from Dr. James Cole. Wiley Mot. 5.
7  That record is, I assume, the neuropsychological report from 1998, prepared by Cole. Just as with
8  the 1996 claim file, Unum indisputably reviewed Cole's report before issuing its September 2021
9  denial. *See* Bishop Decl. ¶ 70. And then Unum carried out another review of the claim including
10 these files and still denied it.[6]

11 Wiley's brief identifies no other allegedly missing records aside from the 1996 claim file
12 and the "pre-2000 medical records," so that is the extent of the dispute. *See Keenan v. Allan*, 91
13 F.3d 1275, 1279 (9th Cir. 1996) ("[I]t is not our task, or that of the district court, to scour the
14 record in search of a genuine issue of triable fact. We rely on the nonmoving party to identify
15 with reasonable particularity the evidence that precludes summary judgment." (internal quotation
16 marks and citations omitted)).[7] Accordingly, Wiley has not shown genuine disputes of material
17 fact that Unum either "ignored" any material document or failed to fully inquire into the basis of
18 its denial. *See Wilson*, 42 Cal. 4th at 720–21. As an undisputed fact, Unum reviewed the 1996

---

[6] Wiley at one point appears to imply that this is irrelevant because the files were reviewed after the initial denial of the claim by Unum, when it reopened the claim, continued investigation, and ultimately denied it again. *See* Unum Oppo. 4. But one of *Wiley's* core arguments is that actions after the initial denial rendered the investigation unreasonable. He argues, for instance, that Holmberg's evaluation—which occurred after the initial determination, as part of the second round of investigation—made the investigation unreasonable. *Id.* 5–6. And he argues that Unum erred by ignoring Wiley's wife's deposition *taken in this suit*. *Id.* 5. He cannot have it both ways: Either the bad-faith inquiry is cabined to the initial investigation or it is not. He also points to no authority for the view that an insurance company cannot reopen an investigation to render it sufficiently thorough and fair. Based on his positions and lack of authority, I assume (without deciding as a matter of law) that events after the initial denial can still affect the (un)reasonableness of the investigation.

[7] In an attempt to make the "unreviewed" evidence look more formidable than it is, Wiley separately argues that individual medical records *from* the 1996 claim file were not downloaded from the CD. Unum Oppo. 4. If the entire claim file was reviewed, the individual components of the file necessarily were too.

claim report and what Wiley calls the "pre-2000 medical records" before issuing its September 2021 denial. And before that, Unum evaluated and reevaluated the claim multiple times. It sent at least six letters to Padway requesting the information it needed, which were not answered. It went through two rounds of independent experts. And it asked its own examiners to reevaluate their views multiple times. Wiley has failed to point to any way in which Unum's investigation and consideration of the evidence was actually deficient.

### ii. Deposition of Deborah Wiley

Next, Wiley argues that Unum ignored the deposition of Deborah Wiley, Wiley's wife, taken in this suit. *See* Unum Oppo. 5. According to him, she testified about the change Wiley experienced after the car accident. *See id.* But Unum reviewed medical professionals' findings of changes brought on by the car accident from 1998, so Wiley has not shown that not considering the lay deposition of an interested witness renders the entire investigation unreasonable. *Cf. Wilson*, 42 Cal. 4th at 720–21 (holding that the totality of the circumstances of the investigation dictate whether it was reasonable). Holmberg also interviewed Deborah Wiley in making his determination. *See infra* Section I.B.v.

### iii. Assessment of Effect of the Car Accident on Disability

In three sentences, Wiley contends that Unum did not ask the experts to "assess the effect of the 1996 motor vehicle collision on the 2013 disability." Unum Oppo. 6. Yet Holmberg opined that the disability was due to "lifelong" somatoform disorder and "not caused by the 1996 automobile accident." Dkt. No. 73-9, Ex. 55. Below, I reject Wiley's argument that Holmberg's opinions should be disregarded. Wiley is incorrect that there was *no* assessment of this issue.

### iv. Diagnosis Instead of Function

Wiley argues that Unum's analysis "seems" focused on "finding a diagnosis" rather than Wiley's "ability to function." It is unclear what flaw in the investigation he means to suggest. There were two primary issues facing Unum: whether Wiley was disabled under the policy and whether it was due to sickness or injury. The "diagnosis" issue relates to the second of these; if the diagnosis is a lifelong personality disorder, that is presumably a "sickness," not the "injury" of the car accident. The rest of Unum's analysis *did* focus on whether Wiley had restrictions or

13

limitations on his ability to work (that is, "function") that qualified him as having a disability. Wiley does not develop this point beyond these few sentences; he does not take issue with any specific determinations or provide any further argument.

### v.  Objections to Holmberg's Examination

Wiley asserts that, when Holmberg carried out his psychiatric examination of Wiley, he "exceeded the scope of his consent." Unum Oppo. 8. In particular, the parties stipulated that "[t]here will be no standardized testing, and no standardized survey instruments." *See* Dkt. No. 78-5, Ex. 7. But Wiley asserts that Holmberg listed four standardized tests he used in his report. *See* Dkt. No. 78-5, Ex. 42. Additionally, Wiley argues that Holmberg interviewed Wiley's wife without his counsel's permission.

As an initial matter, on the testing, Unum's counsel argued at the hearing and Wiley's counsel did not dispute that the four specific tests performed here were common diagnostic tests, not the sort of "standardized" comparative exam the stipulation is aimed at. In any event, Wiley has presented no authority suggesting this behavior alone by an independent examiner violates the covenant of good faith and fair dealing. He has presented no facts that Unum, for instance, instructed Holmberg to do so, which might make the situation different. Unum's counsel represented at the hearing that Holmberg interviewed Wiley's wife after she requested to be interviewed and that Wiley's counsel was, in fact, present (in the sense of being physically near, not in the exam itself). Wiley's counsel did not dispute either point.

Wiley also contends that Holmberg was only asked to opine on the sickness-injury issue in his addendum report, not in the initial one. Unum Oppo. 8–9. His argument is that "[b]ecause Dr. Holmberg was not asked about the sickness v. injury question until after his initial exam, he had no reason to take a history which focused on that point when he had Mr. Wiley available in person for that purpose." *Id.* 9. There are several reasons this does not create a genuine dispute of fact. First, Holmberg relied on other evidence, including contemporaneous evidence, to examine the effect of the car accident. Second, I have already addressed above the issue about whether the accident was considered. Third, Wiley has presented no expert evidence critiquing Holmberg and offers no basis on which a court could do so absent competing expert evidence. *Cf. Guebara v.*

*Allstate Ins. Co.*, 237 F.3d 987, 993 (9th Cir. 2001) (holding that, as a general matter, insurers may rely on expert opinions to overcome bad-faith claims even when there is contrary expert testimony).

### vi. Change in Procedure

Wiley argues that Antaki (one of Unum's reviewing doctors) was going to contact Moskowitz (who diagnosed Wiley) to talk about their differing opinions pursuant to Unum policy but that after Wiley's counsel objected (and offered a written or oral response), Unum decided not to pursue the phone call at all. Wiley never fits this squarely into the reasonableness framework, asking instead "What is the justification for this?" Unum Oppo. 9. He has not shown a genuine dispute of fact that this caused the investigation to become unreasonable. It is also not disputed that Moskowitz's submissions were reviewed and that Szlyk (Unum's psychiatrist) spoke to him. *See supra* Background, Section I.B.ii.

### vii. Bishop's Qualifications

Wiley contends that the benefits specialist handling the file, Bishop, "has no medical education or training" and is not involved in the selection process of independent experts by a third-party contractor. Unum Oppo. 9–10. There is no authority or rationale for the view that the benefits point-person needs medical training when the company relies on the opinions of numerous other medical experts to make its medical determinations. And so long as the third-party selection process is not itself flawed, Wiley has presented no reason that a benefits point-person must be involved in selecting the independent expert or understanding the details of the process for doing so. Indeed, the entire point of selecting an independent expert is to remove Unum from the equation as much as possible. Wiley was able to take discovery into that issue to determine whether the process itself was flawed.

### viii. Summary on Reasonableness of Investigation

There is a genuine dispute between the parties about whether Wiley's disability is due to sickness or injury. Consequently, to survive the genuine dispute rule, Wiley would have to show a genuine dispute of material fact that the investigation was unfair, unreasonable, or not sufficiently thorough. None of his proffered grounds do so. Summary judgment is therefore appropriate.

15

### C. Pre-January 3, 2015, Benefits

Unum moves for summary judgment on Wiley's claims to the extent they are based on denial of benefits prior to January 3, 2015. *See* Unum Mot. 21–24.[8] According to Unum, Wiley filed suit outside of the contractual and statutory statutes of limitations. The policy provided that any lawsuit had to be filed "after the expiration of three years after the time written proof of loss is required to be furnished." *See* Dkt. No. 73-4, Ex. 1. It also required that the proof of loss be filed within 90 days "after each month for which the benefit is payable," but stated that the failure to do so did not "nullify or reduce your claim if proof is furnished as soon as reasonably possible but no more than one year after the 90 days except if you are legally unable to notify us." *Id.* And under California law, the statute of limitations for tortious breach of the covenant of good faith and fair dealing is two years from the denial of benefits. *Love v. Fire Ins. Exch.*, 221 Cal. App. 3d 1136, 1144 n.4 (1990).[9]

Wiley's Opposition did not address this issue. He also did not address it at oral argument, after hearing my tentative ruling on it. After the hearing, Wiley filed what he styled an "administrative motion to augment oral argument." Dkt. No. 84. In it, he substantively responds on this issue, contending that the contractual statute of limitations would have been tolled until September 2021. He still does not address the statutory argument. I will STRIKE this new filing because it is an improper supplemental brief filed without permission. *See Nee v. Fed. Deposit Ins. Corp.*, No. CV0806245MMMAJWX, 2011 WL 13185691, at *1 (C.D. Cal. Mar. 29, 2011) (collecting authorities permitting courts to strike improper supplemental filings).

The motion is granted on this issue. Wiley filed the lawsuit after the limitations period ended on this portion of his claims and he has not put forward any reason it would be tolled. (Indeed, even his supplemental brief only took issue with the contractual limitations period, not

---

[8] Because those benefits were paid, Wiley admits all that is at issue is possible interest owned on them. *See* Unum Oppo. 11.

[9] If the bad-faith claim rests on the implied contractual promise and is not for tort remedies, the statute of limitations is longer. *See Love*, 221 Cal. App. 3d at 1144 n.4. Wiley does not (including in his supplemental brief on this subject) argue that the longer statue should apply here, and he does seek punitive damages, so I apply the two-year statute of limitations.

16

the statutory one.)

### D. Denial or Delay Based on Further Discovery

Last, Wiley argues that summary judgment should be denied, even if otherwise appropriate, because he has more discovery to take. He has not shown he is entitled to delay summary judgment.

FRCP 56(d) provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." But to use the rule as a shield against summary judgment, Wiley must "show that: "(1) it has set forth in affidavit form the specific facts it hopes to elicit from further discovery; (2) the facts sought exist; and (3) the sought-after facts are essential to oppose summary judgment." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 662 (9th Cir. 2020) (internal quotation marks and citation omitted).

Wiley has not met any of these requirements. First, he states that Unum "forced" the date that it gave Wiley the updated claim file to be pushed back multiple times. Unum Oppo. 13. That may be so, but it does not mean there is some fact yet to be *discovered*. If Wiley needed more time to process the discovery he has, he could have moved to extend the summary judgment schedule. Still more, Wiley has not shown what essential fact is missing and likely to be in the updated claim file (which he has). Next, Wiley argues that not all depositions have been completed. His brief specified nothing more, which is insufficient. Even looking to the declaration he references in this section of his brief, Wiley only discusses three depositions in particular: Arlen Green, Dane Street, and "possibly" Steven Feinberg. Dkt. No. 78-1 ¶ 6. On the last, "possibly" is insufficient. But all suffer from a more fundamental problem: Wiley does not specify "the specific facts [he] hopes to elicit from" the depositions or how they would be "essential to oppose summary judgment." *InteliClear*, 978 F.3d at 662. While it appears that Feinberg was only disclosed as a rebuttal expert on November 12, *see* Dkt. No. 78-1 ¶ 6, Wiley must still meet the law's requirements to delay summary judgment on this basis.

## II. WILEY'S MOTION FOR SUMMARY JUDGMENT

Wiley moves for summary judgment on a single issue: that all of the documents he claims were placed on the CD referenced above and mailed by his counsel to Unum, which received them. His motion only would matter (at trial) to the bad-faith claim, which is now irrelevant. And even if that were not so, the motion would be denied. Though Wiley has submitted a declaration from his attorney stating that this occurred, Unum has submitted a declaration from the Unum employee that received the CD. He states that it was (and is) Unum's practice to download all materials received and that he has no reason to believe he deviated from that in this case. *See* Dkt. No. 79-2. Not all files Wiley claims to exist were in Unum's claim file and the CD has since been destroyed pursuant to Unum's practice. *See id.* Accordingly, there is a genuine dispute of fact about whether all the claimed files were transmitted.

## CONCLUSION

Unum's motion for summary judgment is DENIED on the breach of contract claim except as it relates to benefits owed prior to January 3, 2015, and GRANTED on the covenant of good faith and fair dealing claim and for any benefits owed prior to January 3, 3015. Wiley's motion for summary judgment is DENIED.

**IT IS SO ORDERED.**

Dated: December 21, 2021



William H. Orrick
United States District Judge